IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

BARBRA APER                                                                                           PLAINTIFF


v.                           Civil No. 3:14-CV-3040-MEF


CAROLYN COLVIN, Commissioner
Social Security Administration                                                                  DEFENDANT


**<u>MEMORANDUM OPINION</u>**


Plaintiff, Barbra Aper, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A).  In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

**I.        <u>Procedural Background</u>:**

Plaintiff filed her application for DIB on April 19, 2012, alleging an onset date of November 1, 2009, due to fibromyalgia, coronary artery spasm, angina, high blood pressure, vertigo, depression, insomnia, irritable bowel syndrome, chronic fatigue, and chronic pain.  Tr. 104-105, 117, 130-131.  The Commissioner denied Plaintiff's applications initially and on

reconsideration. Tr. 52-53. An Administrative Law Judge ("ALJ") held an administrative hearing on October 30, 2013. Tr. 30-51. Plaintiff was present and represented by counsel.

At the time of the hearing, the Plaintiff was 56 years old. Tr. 23. She possessed a high school education and past relevant work ("PRW") experience as a bus driver, emergency medical technician, and owner/manager of a grocery business. Tr. 23 34, 37, 47-48, 118, 125-129.

On December 13, 2013, the ALJ found Plaintiff's fibromyalgia, hypertension, prior history of vasospastic phenomenon, and obesity were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Tr. 14-16. After partially discrediting her subjective complaints, the ALJ determined the Plaintiff retained the residual functional capacity ("RFC") to perform light work that involves no climbing or work near heights. Tr. 16. With the assistance of a vocational expert, The ALJ then found Plaintiff could perform work as a general office clerk, collector, and assembler. Tr. 24.

The Appeals Council denied review on February 3, 2014. Tr. 1-7. Subsequently, Plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. ECF No. 7. Both parties have filed appeal briefs, and the case is now ready for decision. ECF Nos. 10, 12.

**II.     Applicable Law:**

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v.* Astrue, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin,* 761 F.3d 853, 858 (8th Cir. 2014). As long as there is substantial evidence in the record that

supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). Only if he reaches the final stage does the fact finder consider the Plaintiff's age, education, and work

experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § 404.1520(a)(4)(v).

**III.     Discussion:**

Plaintiff raises the following issues on appeal: 1) whether the ALJ properly evaluated her subjective complaints; 2) whether the ALJ failed to fully develop the record with regard to her fibromyalgia; 3) whether the ALJ's RFC determination is supported by substantial evidence, and, 4) whether she can perform work existing in significant numbers in the national economy.

The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs and the ALJ's opinion, and they are repeated here only to the extent necessary.

**A.     Subjective Complaints:**

In her first issue, the Plaintiff contends that the ALJ failed to conduct a proper credibility analysis with regard to her fibromyalgia.  The ALJ is required to consider all the evidence relating to Plaintiff's subjective complaints, including evidence presented by third parties that relates to: 1) Plaintiff's daily activities; 2) the duration, frequency, and intensity of her pain; 3) precipitation and aggravating factors; 4) dosage, effectiveness, and side effects of her medication; and, 5) functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them.  *Id*.  However, as the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  "An ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances." *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted).  In addition to the "objective medical basis" that should

4

support the subjective testimony of disabling pain, this court also takes into account "all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians." *Polaski*, 739 F.2d at 1322.

The evidence makes clear that Dr. Apichart Radee treated the Plaintiff on seven occasions in 2007 and 2008 for symptoms associated with vasospastic angina pectoris. Tr. 222-223, 238-239. Dr. Radee prescribed Procardia, Zocor, and Crestor. During a follow-up in February 2009, Plaintiff reported increased angina pectoris in cold weather. Tr. 222. Dr. Radee advised her to continue her medications.

On March 4, 2009, Plaintiff presented in the emergency room ("ER") for accelerated hypertension and a severe headache with mild visual changes. Tr. 201-204, 280-288. Her blood pressure was 170/110. Moreover, a CT of her head was negative. The doctor administered Hydralazine and normalized her blood pressure. He also administered a Toradol injection for the headache and Compazine for the nausea. The doctor then discharged her with a prescription for Lisinopril and instructions to contact her cardiologist the following day.

On May 11, 2009, Dr. Radee indicated that she was doing well. Plaintiff voiced no complaints related to her angina pectoris and hypertension. Tr. 222. Her blood pressure was 110/70, and a cardiac exam revealed an S4 gallop. Due to her recent hospitalization for questionable coronary artery spasm, Dr. Radee increased her dosage of Procardia.

On August 17, 2009, Plaintiff returned to Dr. Radee's office with complaints of chest discomfort. Tr. 222. At this time, her blood pressure was 130/80. However, both an EKG and a cardiac exam were normal.

Plaintiff did not seek out further treatment for her symptoms until a follow-up visit with Dr. Radee on May 20, 2010. Tr. 222. The doctor indicated that she was doing well. Her blood pressure was 110/76, and a cardiac exam was unremarkable. She reported no problems since her move to Arkansas.

On February 7, 2011, Plaintiff returned to Dr. Radee's office for complaints of a "tired feeling" radiating bilaterally from her toes to her thighs and nocturnal numbness of both hands, suggestive of possible peripheral neuropathy. Tr. 222. Dr. Radee noted that she had experienced no cardiac symptoms during a stress test. Further, a prior coronary angiogram was normal, revealing an ejection fraction rate of 71 percent. At this time, her blood pressure was normal at 120/80 and a cardiac exam was unremarkable. An EKG showed sinus rhythm with non-specific ST-T change. Dr. Radee diagnosed her with chronic chest pain. He recommended that she continue her current medications and prescribed Nitroglycerine to be taken as needed.

On January 26, 2012, Plaintiff conferred with cardiologist, Dr. Michael Camp. Tr. 298-301. She presented with complaints of chest discomfort and indigestion. Dr. Camp noted her history of vasospastic prinzmetal-type angina. Although her cardiac exam was normal, her blood pressure was 148/80 and an ECG was borderline. Her body mass index was also 37.5. Accordingly, Dr. Camp diagnosed chest pressure, fibromyalgia, prinzmetal angina, and a possible hiatal hernia. He then ordered a cardiolite stress test.

On January 30, 2012, an echocardiogram revealed overall normal left and right ventricular function with an ejection fraction rate of 73 percent. Tr. 294-297. Therefore, Dr. Camp recommended continued blood pressure and antiplatelet therapy. He also indicated that her valvular heart disease was mild and would be treated medically.

A stress test conducted on the same date showed an abnormal resting EKG, but Dr. Camp concluded that this was a normal variant study and recommended further evaluation for non-cardiac sources of her chest discomfort and shortness of breath. Tr. 295-295.

On February 25, 2012, Plaintiff presented at the Midway Clinic after falling on a concrete step, injuring her left side, wrist, hand, knee, and ankle. Tr. 304-306, 459-461, 467. X-rays showed a possible non-displaced scaphoid fracture, so an MRI was ordered. However, all other x-rays revealed no acute fractures or dislocations. Plaintiff was administered an injection of Toradol for a diagnosis of ankle strain/sprain and multiple site contusions. Her ankle and wrist were wrapped; she was prescribed crutches and told to remain non-weight bearing; and, she was prescribed Cataflam (an anti-inflammatory). Two days later, she returned with continued complaints of left wrist and hand pain, and she received a cock-up splint. Tr. 306-308, 462-463. The MRI ultimately showed a benign cyst. Tr. 308-309, 318, 332, 464, 472. The doctor referred her to an orthopedist.

On March 16, 2012, Plaintiff consulted with orthopedist, Dr. Russ Rauls, regarding her left wrist pain and the popping sensation in her knee. Tr. 328-329, 344-345. She reported gradual improvement in her wrist and no real pain in her knee. Dr. Rauls opined that the MRI of her left wrist revealed a volar ligament injury on the radial side, as well as a benign cyst. Further, an examination showed normal strength and sensation with mild tenderness over the volar aspect of the wrist. The Plaintiff acknowledged some improvement in her left knee pain, and the exam revealed full flexion and extension.

On May 8, 2012, Plaintiff returned to the Midway Medical Clinic complaining of continued knee pain. Tr. 310-311, 465-466. She also requested a prescription for diet pills. Virginia Hartness, an advanced practical nurse, diagnosed the Plaintiff with knee pain and fibromyalgia.

7

However, an examination documented no tender points and the Plaintiff had a full range of motion in all joints. Nurse Hartness referred her for physical therapy and recommended a follow-up with Dr. Rauls.

On May 21, 2012, Dr. Rauls administered a Marcaine/Lidocaine injection into the Plaintiff's left knee. Tr. 330, 343, 458. He noted a good range of motion in both the hip and knee. Upon her return on June 18, 2012, Plaintiff reported that the injection had been helpful. Tr. 337, 342. Because an examination revealed some hyperextension, Dr. Rauls recommended an MRI. The MRI ultimately showed minimal degenerative changes with no evidence of a meniscus tear or non-displaced fracture. Tr. 338. Accordingly, Dr. Rauls diagnosed her with "possible cartilage irrigation from the fall," noting that she would likely have pain off and on, but would continue to improve. Tr. 38-339, 341.

On July 5, 2012, Dr. Karmen Hopkins, a non-examining, consultative physician completed a physical RFC assessment. Tr. 351-358. After reviewing the Plaintiff's records, Dr. Hopkins opined that she could perform medium level work. Drs. Jerry Henderson and Janet Cathey affirmed this assessment on October 5, 2012, and November 9, 2012, respectively. Tr. 397, 407.

On July 19, 2012, Plaintiff underwent a consultative mental diagnostic evaluation with Dr. Kenneth Hobby. Tr. 35-370. She denied any history of inpatient or outpatient treatment for emotional or psychiatric problems. Further, although she reported a prior prescription for Cymbalta, Plaintiff indicated that she could not take this medication due to side effects. Dr. Hobby diagnosed Plaintiff with adjustment disorder with depressed mood and assessed her with a global assessment of functioning score of 51-60.[1] Dr. Hobby opined that mentally, she would probably

---

[1] We recognize that the DSM–V was released in 2013, replacing the DSM–IV. The DSM–V has abolished the use of GAF scores to "rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13–CV–01074–NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014) (citing *Rayford v. Shinseki,* 2013 WL 3153981, at *1 n. 2 (Vet. App. 2013)

8

be unable to persist on appropriate skill level work-like tasks for an 8-hour day due to the purported mental fatigue resulting from her fibromyalgia. Tr. 368. However, he found she could understand, remember, and carry out basic work-like tasks; respond adequately to work pressures; and attend to and sustain concentration on basic work-like tasks. Dr. Hobby also noted a normal and steady pace, adequate for basic work-like tasks.

On July 20, 2012, Dr. Christal Janssen completed a psychiatric review technique form. Tr. 375-390. After reviewing all of Plaintiff's medical records, Dr. Janssen found no severe impairment and noted only mild limitations with regard to activities of daily living, social functioning, and concentration, persistence, and pace. Further, she found no episodes of decompensation.

On August 1, 2012, the Plaintiff presented in the ER with complaints of chest pain and pressure, as well as left shoulder pain. Tr. 425-433, 440. Emergency medical technicians administered Nitroglycerine in route to the hospital, resolving her chest pain. However, her shoulder and arm pain persisted. A portable chest x-ray was normal. The doctor diagnosed her with coronary artery disease, fibromyalgia, and anxiety.

On August 30, 2012, Dr. Camp diagnosed Plaintiff with chest pressure symptoms associated with possible progressive ischemic heart disease, severe and life-style limiting fibromyalgia, a history of hiatal hernia, and a prior diagnosis of prinzmetal angina. Tr. 392-394, 454-456. Her medications included Aspirin, Isosorbide, Nifedipine, Nitroglycerine patch, Nitroglycerin spray, and Premarin.

---

(quoting the DSM–V)). However, because the DSM–IV was in use at the time Dr. Hobby conducted the medical assessment in this case, the Global Assessment of Functioning scores remain relevant for consideration in this appeal. *Rayford*, 2013 WL 3153981, at *1 n. 2.

On September 5, 2012, Dr. Camp noted her treatment for severe chest pain radiating into her neck, shoulders, and arms on August 1. Tr. 486-488. She reported experiencing recurrent episodes of chest pressure over the past several weeks. Again, Dr. Camp noted her very life-style limiting fibromyalgia issues, but documented no physical limitations or tender points to support this diagnosis. Further, he noted a normal cardiac exam, and concluded that her problems were very complex. Because the nature of her pain had changed since her last catheterization, Dr. Camp ordered a second test. Again, testing revealed normal coronary arteries and a normal ejection fraction rate of 50 percent. Tr. 489-492.

On June 26, 2013, Plaintiff returned to Dr. Camp's office after experiencing an episode of near syncope. Tr. 483-485. Records indicate that this was an isolated event lasting about 10 seconds. Dr. Camp diagnosed hypertension, sick sinus syndrome, near syncope, and noncardiac chest pressure with a history of fibromyalgia. He made no changes to her medication and documented "[n]o activity restriction from my standpoint." Dr. Camp advised her to monitor her blood pressure closely and taper off the Nifedipine when her systolic pressure was consistently less than 130.

Contrary to the Plaintiff's assertion, the ALJ properly evaluated her credibility. Although he did not specifically mention *Polaski*, the ALJ considered the *Polaski* factors. He recited the many notations of Dr. Camp indicating that her cardiac symptoms were improving and she was doing well. At least two heart catheterizations and one stress test were normal, documenting a normal ejection fraction rate. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). Further, at her last visit, Dr. Camp indicated that she had an excellent prognosis and specifically noted "[n]o activity

10

restrictions from my standpoint." Thus, while we do agree that the Plaintiff's heart condition is somewhat limiting, it is not as disabling as alleged.

Plaintiff's left knee, wrist, and hand injuries also appear to have improved with conservative treatment. An injection into her knee in March 2012 was reportedly helpful. *Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). Further, an MRI showed only minimal degenerative changes with no evidence of a meniscal tear or a non-displaced fracture, x-rays of her hand and wrist were negative, and physical exams failed to yield any significant or permanent limitations. S*ee Forte*, 377 F.2d 895. In fact, at her last visit with Dr. Rauls in July 2012, he indicated that she would continue to improve. Plaintiff sought out no further treatment for her knee pain after that, and she failed to participate in physical therapy as prescribed. The record is also devoid of evidence documenting prescriptions for pain medication, calling into question her actual level of pain. *Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999) (infrequent use of prescription drugs supports discrediting complaints).

As for her fibromyalgia, the ALJ correctly points out that doctors diagnosed her with fibromyalgia after a fall in February 2012, but there is no evidence to support this diagnosis. *Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014) (merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing). Fibromyalgia is a condition that causes pain in fibrous tissues, muscles, tendons, ligaments and other "white" connective tissues. The disease is chronic, and "[d]iagnosis is usually made [only] after eliminating other conditions." *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003). The principal symptoms are "pain all over," trauma, anxiety fatigue, disturbed sleep, stiffness, irritable bowel symptoms, and the only symptom that discriminates between it and

11

other diseases of a rheumatic character is the presence of multiple tender spots, more precisely eighteen fixed locations on the body that when pressed firmly cause the patient who really has fibromyalgia to flinch.  *See* THE MERCK MANUAL 1369-1371 (16th ed. 1992).

As previously noted, repeated physical exams yielded few, if any limitations.  *See Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (lack of supporting medical evidence is one factor that may be considered in assessing credibility).  There are certainly no indications in the record that she exhibited the tender points necessary for a fibromyalgia diagnosis.  Plaintiff relies on Dr. Camp's diagnosis of "very life-style limiting fibromyalgia" to establish the severity of her fibromyalgia.  However, Dr. Camp also found "no activity restrictions."  *See Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005) (none of the claimant's treating physicians opined the claimant was so impaired or disabled that the claimant could not work at any job).  Further, he never referred the Plaintiff to a rheumatologist, nor did he prescribe medication to treat her alleged fibromyalgia.  In fact, the record reveals only one medication prescribed for fibromyalgia.  In May 2012, Nurse Hartness prescribed Savella.  Unfortunately, it appears that doctors prescribed this medication on only one occasion.  Plaintiff also failed to seek out emergency treatment for her alleged fibromyalgia pain, further suggesting it was not as disabling as alleged.

Mentally speaking, the record is devoid of any significant treatment for mental impairments.  During an evaluation ordered by the Administration, Dr. Hobby stated she would likely be unable to persist on appropriate skill level work-like tasks for an eight-hour workday due to her reported mental fatigue from fibromyalgia.  Interestingly, he also indicated that she could understand, remember, and carry out basic work-like tasks; respond adequately to work pressures; attend to and sustain concentration on basic work-like tasks; and perform at an adequate and steady pace to complete basic work-like tasks.  Further, he assessed her with a GAF score indicative of

only moderate limitations. Therefore, it appears that Dr. Hobby's assessment actually detracts from her credibility more than it supports it.

Additionally, Plaintiff never voiced any complaints to her doctor concerning mental fatigue. The record does reveal some treatment for situational depression related to deaths in the family and her move to Arkansas, but she denied a history of formal mental health treatment or hospitalization for her symptoms. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (lack of formal treatment by a psychiatrist, psychologist, or other mental health professional is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental Impairment). Plaintiff did report a prior prescription for Cymbalta, but discontinued it due to side effects. There is, however, no evidence to indicate doctors prescribed any other anti-depressants.

Plaintiff's daily activities also call her credibility into question. She admitted caring for her cats, performing light housework, watering her plants, deep cleaning whenever necessary, preparing simple meals, shopping for groceries, walking, handling finances, reading, playing computer games, watching television, going to the beauty salon monthly, visiting friends twice weekly, having breakfast with her neighbors weekly, and going out to eat twice weekly. Tr. 133-140. When considered in conjunction with the medical records, these activities do not support the level of restriction the Plaintiff has alleged. Clearly, an individual who is capable of performing these activities can perform some work-related activities.

The Plaintiff asserts that her strong work history entitles her to substantial credibility. We disagree. Work history is but one of the factors to be considered in the credibility analysis. Unfortunately, in this case, her favorable work history does not outweigh the medical evidence or inconsistencies outlined above. Accordingly, we find that substantial evidence supports the ALJ's credibility findings.

**B.	Develop the Record:**

The Plaintiff also argues that the ALJ should have developed the record with regard to her fibromyalgia. The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Plaintiff asserts that the ALJ should have contacted Dr. Camp for additional information concerning his diagnosis of fibromyalgia. We disagree. Dr. Camp's exams were very thorough. His failure to document any objective findings to support his statement of "life-style limiting" fibromyalgia, coupled with his assessment of no limitations speaks volumes. Dr. Camp is a cardiologist who in all probability was merely reciting a diagnosis based entirely on the Plaintiff's subjective reports. His mere recitation of her subjective complaints is not a sufficient basis for remand. *See Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (holding that the ALJ may give less weight to a medical opinion that is based largely on subjective complaints rather than on objective medical evidence). Accordingly, we find sufficient evidence upon which the ALJ could have based his determination that the Plaintiff is not disabled.

### C. RFC:

Plaintiff also contends that the record does not support the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545, 416.945. The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, medical evidence that addresses the claimant's ability to function in the workplace must support the ALJ's RFC determination. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The Plaintiff insists that she is unable to perform light work because she experiences coronary artery spasms several times per day causing increased blood pressure and shortness of breath; fibromyalgia with constant pain radiating into her arms, neck, back, and legs; obesity; and, two episodes of vertigo per month with accompanied vomiting. However, as addressed in the first section of our opinion, the objective evidence does not support the Plaintiff's allegations. Her treating cardiologist noted improvement, opined that her prognosis was "excellent," and assessed no limitations. Further, although doctors diagnosed her with fibromyalgia, the record provides no objective evidence to support this diagnosis. None of the examining doctors documented the requisite tender points for a fibromyalgia diagnosis. Further, the Plaintiff took no prescribed medications for this impairment and required no emergent treatment. In fact, she took no pain medication whatsoever. In addition, despite diagnosing Plaintiff with severe fibromyalgia, Dr. Camp assessed her with no limitations.

The ALJ also noted that the Plaintiff suffered from obesity. Because obesity is no longer a stand-alone impairment, he properly considered it in combination with her other impairments.

We agree that the record makes no mention of any additional restrictions or limitations imposed by her obesity. Thus, even in combination with her impairments, her obesity is not disabling.

Additionally, as stated above, we do not find the Plaintiff's mental impairment to be severe. She reported a history of situational depression, caused by deaths in her family and a move to Arkansas. Although she was prescribed Cymbalta, Plaintiff does not take it due to alleged side effects. Dr. Hobby did diagnose her with adjustment disorder with depressed mood, but he assessed her with a GAF score of 51-60, which is indicative of only moderate symptomology. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 34 (4th ed. 2000). He also opined that her GAF for the previous year had been 61-70, indicating only mild symptoms. *Id*.

Dr. Christal Janssen, a non-examining consultant, found Plaintiff's mental impairment to be non-severe. Based on her failure to seek out mental health treatment or voice ongoing complaints of her alleged mental impairments, we agree.

Therefore, although we note Dr. Hopkins assessment of medium level work, giving the Plaintiff the benefit of the doubt, we find substantial evidence to support the ALJ's RFC assessment. We do believe that the combination of Plaintiff's fibromyalgia, chest pain, left knee pain, and obesity would limit her to light work involving no climbing or work near heights.

### D. **Step Five:**

In her final issue, the Plaintiff disputes the hypothetical questions posed to the VE. However, "[t]he ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)). Here, the ALJ's hypothetical question included all the limitations found to exist by the ALJ and set forth in the ALJ's RFC determination. *Id*. Based on our previous conclusion that

substantial evidence supports that ALJ's RFC findings, we hold that the hypothetical question was proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits. *Id.*, *see also* Lacroix, 465 F.3d at 889.

**V.      Conclusion:**

Having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and affirms the decision. The undersigned further directs that the Plaintiff's Complaint be dismissed with prejudice.

DATED this 7th day of August, 2015.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE